**GRAIN PROCESSING CORPORATION,**
Plaintiff-Appellant,

v.

**AMERICAN MAIZE–PRODUCTS COMPANY, Defendant/Cross–Appellant.**

Nos. 87–1308, 87–1340.

United States Court of Appeals,
Federal Circuit.

Feb. 17, 1988.

John J. Cavanaugh, of Neuman, Williams, Anderson & Olson, Chicago, Ill., argued for plaintiff-appellant. With him on the brief was Gregory B. Beggs, of Neuman, Williams, Anderson & Olson.

William D. Lucas, of Lucas & Just, New York City, argued for defendant/cross-appellant.

Before FRIEDMAN and MAYER, Circuit Judges, and SKELTON, Senior Circuit Judge.

## OPINION

MAYER, Circuit Judge.

These are cross-appeals from a decision of the United States District Court for the Northern District of Indiana that claims 11–14 of United States Letters Patent No. 3,849,194 ('194 patent) were valid and infringed by the ARD 2370 product made by American Maize–Products Co. The court held, however, that Maize's Fro–Dex 5 and Fro–Dex 10 products did not infringe. We reverse the determination that Fro–Dex 10 did not infringe claims 12–14, and remand for consideration of whether increased damages and attorney fees should be awarded. All other aspects of the district court's decision are affirmed.

### Background

This case is about starch conversion products known as starch hydrolysates. The patented hydrolysates, which are low in sweetness and taste bland, can be used as carriers for synthetic sweeteners and as bulking agents in synthetic creams and coffee whiteners.

Frederick C. Armbruster and Earl R. Kooi developed the patented products in response to the interest of the food industry in obtaining a starch hydrolysate that would be "soluble in cold water, non-hygroscopic, give clear solutions, [and] be bland in flavor and colorless." They filed their original patent application on December 19, 1966. Obtaining the patent was difficult, however, and the prosecution history is littered with rejections by the Patent and Trademark Office (PTO) and an unsuccessful appeal to the Board of Patent Appeals and Interferences. Finally, on November 19, 1974, the '194 patent was issued.

The patent consists of ten process claims and four product claims. Grain Processing Corp. (GPC), the assignee of the patent, originally charged American Maize–Products Co. (Maize) with infringement of all 14 claims. Before trial, however, GPC withdrew charges of infringement of the process claims but continued to assert infringement of the product claims, claims 11–14. They read as follows:

11. A waxy starch hydrolysate having a dextrose equivalent value between 5 and 25 and a saccharide composition wherein the amount of DP(1) is in the range of from about 0.1 percent by weight, to about 2.4 percent by weight, dry basis, and the amount of DP(2) is in the range of from about 1.3 percent to about 9.7 percent by weight, dry basis, said hydrolysate being further characterized as producing a fluid solution free of opacity (exceptional clarity and complete lack of opaqueness) when the hydrolysate is added to water at solids concentrations specified below:

| DEXTROSE EQUIVALENT OF WAXY STARCH HYDROLYSATE | SOLIDS CONCENTRATION PERCENT BY WEIGHT |
| --- | --- |
| 10 | 65–70 |
| 20 | 75 |
| 25 | 80 |

12. A waxy starch hydrolysate having a dextrose equivalent value between about 5 and about 25,

a descriptive ratio greater than about 2, said descriptive ratio being the quotient obtained by dividing the sum of the percentage of saccharides, dry basis, having a degree of polymerization of 1 to 6, by the dextrose equivalent value,

a monosaccharide content in the range of from about 0.1 percent by weight to about 2.4 percent by weight, dry basis,

a disaccharide content in the range of from about 1.3 percent to about 9.7 percent, by weight, dry basis, and

being further characterized as capable of producing an aqueous solution of exceptional clarity and substantially complete

lack of opaqueness when said hydrolysate is added to water.

13. A waxy starch hydrolysate in accordance with claim 12, having a moisture content of less than 15 percent, by weight.

14. A waxy starch hydrolysate in accordance with claim 12, having a mositure [sic] content of about 4 percent, by weight and being further characterized as being a waxy starch hydrolysate syrup solid product which is substantially 100 percent soluble and capable of forming an aqueous solution completely free of haze.

Maize denied infringement and counterclaimed that the '194 patent was invalid under 35 U.S.C. § 112, was anticipated by the prior art under 35 U.S.C. § 102, and was obvious over the prior art under 35 U.S.C. § 103. It also claimed the patent was unenforceable because of inequitable conduct by GPC's predecessor, Corn Products Co.

The issues of liability and damages were bifurcated and a 32–day trial on liability followed. The district court held that Maize had not shown there was a case or controversy over the ten process claims because there was no reasonable apprehension that it would be sued for infringement of those claims. It concluded further that Maize had not proven the four product claims were invalid. In the court's view, the '194 patent did not violate section 112 because the terms of the product claims were sufficiently definite and precise. The court also held that the invention was not anticipated by the prior art because Wallerstein, the alleged anticipating source, did not have the claimed invention's capacity to produce starch hydrolysates that remained haze-free over time.

As to Maize's attempt to invalidate the patent as obvious in light of the prior art under section 103, the district court decided that the references, either alone or in combination, did not teach or suggest the patented invention. Furthermore, there had been no showing that the predecessor Corn Products Co. had violated the prohibition in section 102(b) against public use of a prod-

uct more than one year prior to the patent application.

On infringement, the district court concluded that one accused product, ARD (Fro–Dex) 2370, infringed each of the four product claims of the '194 patent. It found, however, that the two remaining accused products, Fro–Dex 5 and Fro–Dex 10, did not infringe any of the product claims.

The primary basis for the court's finding of no infringement was that, when read in light of the specification and the prosecution history, the '194 patent required "exceptional long-term clarity." The accused products led to initially clear solutions, but the court said there was no showing that they remained clear for an appreciable length of time. Because long-term clarity was "of the essence in" the patent, the court concluded neither Fro–Dex 5 nor Fro–Dex 10 infringed.

### Discussion

The only issue raised by GPC on appeal is whether the district court erred in holding that the Fro–Dex 10 product did not infringe claims 11–14. Maize, on the other hand, raises a wide variety of questions, most of which address the validity of the '194 patent. We turn first to validity.

*Validity*

A. *Process Claims.* As a preliminary matter, we address Maize's contention that the district court erred in holding that there was no case or controversy over the ten process claims. Maize says it was entitled to a declaratory judgment of invalidity on those claims because the original complaint filed by GPC alleged they were infringed.

■ There is no question that a case or controversy is a jurisdictional predicate for declaratory judgment under 28 U.S.C. § 2201. *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398, 222 USPQ 943, 949 (Fed.Cir.1984); *see also Windsurfing Int'l, Inc. v. AMF, Inc.*, 828 F.2d 755, 757, 4 USPQ2d 1053, 1054–55 (Fed.Cir. 1987). And "an actual controversy must be extant at all stages of review, not mere-

ly at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). The actual controversy requirement precludes a declaration about the validity of claims unless the defendant objectively has a "reasonable apprehension that it will face an infringement suit" on those claims. *Webb*, 742 F.2d at 1388, 222 USPQ at 949; *International Medical Prosthetics Research Assoc. v. Gore Enterprise Holdings, Inc.*, 787 F.2d 572, 575, 229 USPQ 278, 281 (Fed.Cir.1986).

Here, Maize has no "reasonable apprehension" it will face an infringement suit on the process claims. GPC abandoned its charge that Maize had infringed them prior to trial, and since then has "steadfastly refused to assert infringement" of those claims. There is also nothing in the record to suggest that Maize will be faced with a similar infringement suit in the future. Therefore, no case or controversy surrounds them, and the district court correctly refused to consider a declaratory judgment of invalidity. *Cf. Medical Prosthetics*, 787 F.2d at 575, 229 USPQ at 280 (existence of case or controversy must be determined from the "totality of the circumstances").

B. *Product Claims.* Recognizing the statutory presumption that a patent is valid, 35 U.S.C. § 282, the district court upheld the validity of the four product claims. Maize attacks this holding, but it has shown no error.

1. *Public Use.* Section 102(b) precludes "attempts by the inventor or his assignee from commercially exploiting [an] invention more than a year before the application for patent is filed." *Western Marine Elec., Inc. v. Furuno Elec. Co.*, 764 F.2d 840, 845, 226 USPQ 334, 337 (Fed.Cir.1985). Maize says that statute was violated here because GPC's predecessor, Corn Products Co., put its product into public use more than one year prior to the application for the '194 patent. We disagree.

■ " 'Public use' of a claimed invention under section 102(b) has been defined as any use of that invention by a person other than the inventor who is under no limita-

tion, restriction or obligation of secrecy to the inventor." *In re Smith*, 714 F.2d 1127, 1134, 218 USPQ 976, 983 (Fed.Cir.1983). Public use does not, however, encompass use that "was primarily for bona fide experimental purposes." *Id.* According to the Supreme Court:

> The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as … a [public] use.

*City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. (7 Otto) 126, 134, 24 L.Ed. 1000 (1878); *see TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 972, 220 USPQ 577, 583 (Fed.Cir. 1984) (no finding of invalidity where dental appliances used experimentally on patients more than one year prior to patent application).

The district court found that the use of the patented product more than one year prior to the patent application was experimental. Corn Products Co. had shipped some samples of it to a few food manufacturers. As the court also found, however, it was industry custom "to submit samples of proposed products to food manufacturers for determination of the product's utility." The evidence showed that this testing was necessary because ingredients like starch hydrolysates may interact adversely with other food ingredients in the manufacturers' products. Furthermore, the testing period was short, very small quantities of the samples were shipped, and they were free of charge. Because there was nothing in Corn Products' conduct that was "inconsistent with experimentation," *see TP Laboratories*, 724 F.2d at 972, 220 USPQ at 583, the district court correctly determined that there had been no public use. *See Western Marine Elec.*, 764 F.2d at 845, 226 USPQ at 337–38 (totality of the circumstances relating to the character and extent of commercial activities must be considered under section 102).

■ 2. *Inequitable Conduct.* Maize also says the '194 patent is unenforceable because Corn Products Co. was guilty of

inequitable conduct in failing to disclose Underkofler, Denault & Hou, *Enzymes in the Starch Industry*, 17 Die Starke 179 (1965), to the PTO when it applied for the patent. This is without merit. " 'Inequitable conduct' requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information." *J.P. Stevens & Co. v. Lex-Tex., Ltd.*, 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir.1984). The Underkofler publication does not meet this test. It spoke to high dextrose equivalent (D.E.) syrups with a high maltose content, and which do not claim to produce clear solutions in water. The '194 patent, on the other hand, claims low D.E. products having a low maltose content, and which produce clear solutions in water. Underkofler bears little, if any, relevance to the patented product.

Moreover, there is no evidence the patentees acted with the requisite state of mind when they did not disclose Underkofler. The patentees were aware of the publication, having cited it in an article they had written. But there was no evidence they failed to disclose it either intentionally or through gross negligence. *See, e.g., J.P. Stevens & Co.*, 747 F.2d at 1560, 223 USPQ at 1092 (intent or gross negligence required for inequitable conduct); *In re Jerabek*, 789 F.2d 886, 891, 229 USPQ 530, 533 (Fed.Cir.1986) (at least gross negligence needed for inequitable conduct). Indeed, because of Underkofler's lack of relevance, it is doubtful they were guilty of even simple inadvertence in the non-disclosure. *Cf. Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1540, 222 USPQ 553, 561 (Fed.Cir.1984) (simple negligence insufficient for inequitable conduct). Accordingly, the patent was not unenforceable because of inequitable conduct.

■ 3. *Obviousness.* The district court likewise correctly concluded that the product claims were not invalid as obvious over the prior art under section 103. When resolving an obviousness issue, "the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making

the combination." *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1462, 221 USPQ 481, 488 (Fed.Cir.1984). Care must be taken to avoid hindsight reconstruction by using "the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012, 217 USPQ 193, 199 (Fed.Cir.1983).

Both parties agree that the *Wallerstein Company Technical Bulletin Number 236* (April 1964) and *Wallerstein Company Data Sheet No. 242* (January 1965) are the "best" prior art references. Wallerstein, however, diverges from the patented invention in an important way: solutions resulting from the patented product remain clear for long periods of time, while haze ultimately forms in the Wallerstein solutions.

The other references cited by Maize to establish obviousness have little relevance. For example, Pigman et al., Patent No. 2,609,326, relates to laundry starch. Obviously, there is no requirement that laundry starch be bland in taste or have low sweetness. Likewise, Schock et al., Patent No. 2,876,160, has to do with the incorporation of materials such as insecticides or paints into a starch matrix. It does not disclose the type of waxy starch hydrolysate disclosed in the '194 patent. Furthermore, it says nothing about products that have the monosaccharide or disaccharide content, or the descriptive ratio of the patented products.

■ Maize's effort to establish obviousness by showing that each element of the patented products may be found somewhere in the prior art is also unavailing. In determining obviousness, "the inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention as a whole for which patentability is claimed." *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108, 2 USPQ2d 1826, 1832 (Fed.Cir. 1987). Here, the cited references would not have been sufficient, either alone or in combination, to suggest the invention to

one of ordinary skill in the art. *See ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577, 221 USPQ 929, 933 (Fed. Cir.1984). Accordingly, the district court correctly refused to invalidate the claims under section 103.

C. *Conclusion on Validity.* Maize's remaining arguments are also without merit. Therefore, we affirm the validity of the four product claims, and move to the question of infringement.

*Infringement*

 A. Resolution of an infringement issue is a two-step process. First, "the meaning of the claims must be learned from a study of all relevant patent documents," and second, "the claims must be applied to the accused structures." *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1114, 219 USPQ 185, 187 (Fed. Cir.1983); *Autogiro Co. v. United States*, 384 F.2d 391, 401, 181 Ct.Cl. 55, 155 USPQ 697, 705 (1967). All claims must be construed in light of the specification and the prosecution history. *See, e.g., McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 673, 221 USPQ 944, 949 (Fed.Cir.1984); *SSIH Equip. S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 376, 218 USPQ 678, 688 (Fed.Cir.1983).

 B. *Claim 11.* Claim 11 contains four elements: (1) the product must be a waxy starch hydrolysate; (2) it must have a D.E. value between 5 and 25; (3) it must have specified DP(1) (glucose or monosaccharide) and DP(2) (maltose or disaccharide) values; and (4) it must have "exceptional clarity and complete lack of opaqueness" when it is added to water at a minimum solids concentration of 65% by weight. At trial, Maize conceded that its product met the first three elements. So the only disputed issue on this appeal is whether Fro–Dex 10 exhibits "exceptional clarity and complete lack of opaqueness" at a minimum solids concentration of 65% by weight.

There was abundant evidence at trial that Fro–Dex 10 produced a solution that was clear at solids concentrations *below* 65% by weight. Maize's documents show that:

1. At a 50% solids concentration, Fro–Dex 10 was "clear as water" after a period of 72 hours. *Internal Correspondence* (Nov. 30, 1973).

2. At a 60% solids concentration, the Fro–Dex 10 product "dispersed in 30 seconds" and had "complete clarity in less than 10 minutes." *Internal Correspondence* (Mar. 28, 1979).

3. At a 15% solids concentration, Fro–Dex 10 samples had no visible haze after four days. *Internal Correspondence* (Feb. 13, 1980).

4. Fro–Dex 10 had 99.8% transmittance in a 50% solids solution. *Internal Correspondence* (Nov. 1, 1984).

Likewise, when GPC ran its own tests on Fro–Dex 10, it found clarity at solids concentrations *below* 65%:

1. In 1974, a sample of Fro–Dex 10 produced a "water clear" solution at a 25% solids concentration. *Technical Service Report* (June 12, 1974).

2. In 1977, a sample of Fro–Dex 10 produced a "clear" solution but the solids concentration is unspecified. *Intra-Company Correspondence* (Mar. 21, 1977).

3. In 1980, two different samples of Fro–Dex 10 produced clear solutions, but the solids concentration levels are unspecified. *Technical Service Report* (Nov. 10, 1980).

These tests establish that Fro–Dex 10 produces a clear solution, but not at the minimum 65% solids concentration required by claim 11. Only one document, an October 28, 1982, internal GPC memorandum, shows that at that concentration Fro–Dex 10 produced a "clear" solution. It also shows that the solution had D.E., DP(1) and DP(2) levels within the ranges specified in claim 11. So at first glance, it appears that Fro–Dex had all the features required by claim 11.

As noted, however, a claim must be read in light of the prosecution history. *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701–02, 15 L.Ed.2d 545 (1966); *McGill*, 736 F.2d at 673, 221 USPQ at 949; *SSIH Equip.*, 718 F.2d at 376, 218 USPQ at

688. In this case, the prosecution history of the '194 patent is critical to a proper interpretation of the term "exceptional clarity and complete lack of opaqueness" as used in claim 11.

Part of the problem in obtaining the patent was that there had already been substantial research in the starch hydrolysate field. Therefore, one of the most significant hurdles facing the patentees, Armbruster and Kooi, was distinguishing their work from the prior art. The examiner repeatedly rejected their application under section 103, citing Wallerstein as the primary reference. The patentees were able to secure the patent only after convincing the PTO that the claimed invention significantly differed from Wallerstein in clarity. As Armbruster explained in remarks accompanying a June 17, 1974, amendment to the '194 patent:

[I]t should be recognized that the starch hydrolysates of the present invention are characterized as being capable of remaining haze-free in concentrated solutions for *long periods of time....* The Wallerstein references do not refer to the products as being haze-free upon standing for long periods of time. It is one of the objectives of the affidavits of record to demonstrate that the Wallerstein starch hydrolysates became hazy upon standing, whereas the starch hydrolysates of the present invention remain haze-free for *long* periods of time. It is this precise characteristic that contributes to the commercial success of the ... claimed products where the hydrolysates of the prior art had failed.

In view of this prosecution history, it is evident that when the patentees stated that their product had "exceptional clarity and complete lack of opaqueness" they meant that—unlike solutions from the Wallerstein reference which were initially clear but soon developed haze—the claimed products resulted in both initial and long-term clarity. According to the district court:

Notable for purposes of determining this case is the patentee's assertion that the central distinguishing feature between the product of their invention and the

products of the prior art is the capacity of their invention to remain haze free over long periods of time. [Maize] has itself observed that this feature, the characteristic of remaining haze free and retaining exceptional clarity over time, is an essential element of the '194 patent. And it was the representation of this quality that evidently convinced the patent examiner that the invention of the application was a substantial and patentable improvement over the prior art and should be allowed. I conclude that this feature of clarity, long-term clarity, is of the essence in the invention. It must be demonstrated that an accused product possesses this feature before it can be considered to meet "exceptional clarity" elements in the patent's product claims.

So the term "exceptional clarity" requires that a product exhibit long-term clarity, and notwithstanding GPC produced one document showing that Fro–Dex 10 was initially clear at a 65% solids concentration, it offered nothing to show that Fro–Dex 10 was clear for any length of time at that level.

But GPC strenuously contests the finding of non-infringement, saying the district court "was in error in holding that the clarity or lack of opaqueness feature must be determined by one specific procedure." It argues that the court improperly limited the patent to an example in the specification by assuming that long-term clarity could only be determined spectrophotometrically using a particular wave length and a particular size of cell to determine light transmittancy. *See, e.g., Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 699, 218 USPQ 865, 871 (Fed.Cir.1983) (claim, not the specification, measures the invention). Long-term clarity can be measured using visual tests as well as spectrophotometric procedures.

The argument does not help. The court did not limit the test for long-term clarity to a spectrophotometric procedure. In reaching its finding of non-infringement, the court looked at all the evidence of long-term clarity, including that based on visual observation. According to the court:

One skilled in the art should find it sufficiently clear and definite that "exceptional clarity" means a light transmittance percent reasonably near the ranges shown on Table 2, when measured at 600 mu with a 4 centimeter cell.

This is not to suggest, however, that proof of exceptional clarity must be in the nature of empirical measurement only. *Rather, it could also be proved, for example, by competent testimony of the visual observations of witnesses who are experienced in the field of starch hydrolysis....*

Later the court said, "Claims in a patent should not be limited strictly to preferred embodiments or specific examples in the specifications." Likewise, on reconsideration the court expressly acknowledged that the test for "exceptional clarity" should not be limited to one specific procedure.

[I]t is impermissible to limit the claims of a patent to examples shown in the specifications....

... [E]xceptional clarity need not be shown with mathematical precision—for it also can be proved by testimony about the visual observations of witnesses who are experienced in the field of starch hydrolysis. I conclude that the concept of "exceptional clarity" really is not vague nor difficult to understand. Exceptional clarity may be proved by the testimony of those with experience in the field with knowledge of the patented product and the products in the prior art. It should not be strictly limited in proof to a mathematical value....

Contrary to GPC's assertions, therefore, the district court examined all of GPC's evidence seeking to show that Fro–Dex 10 exhibited exceptional clarity. There was just no evidence under any test, either visual or spectrophotometric, that it had the long-term clarity at the minimum 65% solids concentration required by claim 11. Accordingly, GPC's allegation that claim 11 was infringed fails.

■ C. *Claim 12.* Claim 12 requires that an infringing product meet five limitations: (1) the product must be a waxy starch hydrolysate; (2) it must have a dext-rose equivalent between 5 and 25; (3) it must have monosaccharide and disaccharide contents within the ranges specified in the claims; (4) it must have a descriptive ratio "greater than about 2"; and (5) it must have "exceptional clarity and substantially complete lack of opaqueness." As can be seen, this is different from claim 11 in two important aspects. First, claim 12 requires that an accused product have a "descriptive ratio of greater than about 2"; claim 11 does not. Second, although claim 12 requires "exceptional clarity" it does not specify that this feature be exhibited at a minimum solids concentration of 65% like claim 11. As in claim 11, however, the term "exceptional clarity," when read in light of the prosecution history, requires long-term clarity.

It was demonstrated at trial that Fro–Dex 10 met the first three requirements of claim 12. Maize conceded its product was a waxy starch hydrolysate. Furthermore, samples of Fro–Dex 10 "invariably" met the D.E. value limitation and "almost always" had monosaccharide and disaccharide contents within the ranges specified in the claim. The only disputed issues were whether the accused product met claim 12's exceptional clarity and descriptive ratio limitations.

The descriptive ratio is calculated by dividing the D.E. value into the sum of the percentage by weight content of DP(1) through DP(6) with the DP(1) and DP(2) content more critical for our purposes than the saccharides of higher degrees of polymerization. The D.E. value being the divisor, it plays a critical role in the determination of descriptive ratio. But there is more than one scientifically acceptable method for calculating D.E. When GPC tested samples of Fro–Dex 10 using its selected method for calculating D.E., it came up with descriptive ratio values in excess of 2. On the other hand, when Maize analyzed the same samples, using a different method to calculate D.E., it found descriptive ratios well below 2. Even using its method, however, Maize found that a sample had a D.E. of 1.9. After reviewing this data, the district court determined that there was suffi-

cient evidence to show that "Fro–Dex 10 meets the descriptive ratio requirement of 'greater than about 2' in some instances." This factual determination is not clearly erroneous and we cannot disturb it. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986) (application of claim to accused structure is a matter of fact, reviewed for clear error); *Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 691 n. 9, 227 USPQ 845, 848 n. 9 (Fed.Cir.1985).

Having found that Fro–Dex 10 met the descriptive ratio requirement, however, the court did not find infringement because "there [was] no evidence that Fro–Dex 10 meets the long-term clarity requirement of claim 12." We disagree. There is substantial evidence in the record showing that Fro–Dex 10 does in fact exhibit long-term clarity and this makes the finding of no infringement clearly erroneous. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 961, 220 USPQ 592, 600 (Fed.Cir.1983) (infringement is a factual determination reviewed under the clearly erroneous standard).

Maize's own documents show that, while a comparative product became cloudy over time, at a 50% solids concentration Fro–Dex 10 was "clear as water" after a period of 72 hours. In another Maize study, Fro–Dex 10 samples at a 15% solids concentration had no visible haze after four days. *Internal Correspondence* (Feb. 13, 1980). Because Maize's own documents demonstrate long-term clarity, it was error for the district court to find that Fro–Dex 10 did not meet this requirement.

It is true that the tests establishing the long-term clarity of Fro–Dex 10 were conducted at solids concentrations below 65%. But unlike claim 11, claim 12 does not specify a solids concentration at which long-term clarity must be exhibited. It is improper to read the limitations of one claim into another, *see, e.g., D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574, 225 USPQ 236, 239 (Fed.Cir.1985), *later appeal*, 802 F.2d 421, 231 USPQ 276 (Fed.Cir. 1986), so it is inappropriate to read claim 12 to require that a product exhibit long-term clarity at a minimum solids concentration of 65%. Because the solids concentration limitation of claim 11 is inapplicable to claim 12, the tests establishing the long-term clarity of Fro–Dex 10 at concentrations below 65% are sufficient to establish infringement of that claim.

D. *Claims 13 and 14.* Claims 13 and 14 depend from claim 12, and Maize conceded during trial that Fro–Dex 10 met the additional elements required by those claims. It admitted that Fro–Dex 10 (1) has a moisture content of less than 15 percent; (2) has a moisture content of about 4 percent; and (3) is 100 percent soluble to form an aqueous solution. Therefore, the only dispute over infringement of claims 13 and 14 was whether the accused product met the requirements of claim 12. Because Fro–Dex 10 infringes claim 12, it infringes claims 13 and 14.

E. *ARD 2370.* ARD 2370 meets all the limitations of claims 11–14. There is no dispute that it is a waxy starch hydrolysate with DP(1) and DP(2) values in the range identified in the '194 patent. Furthermore, the evidence showed that a sample of ARD 2370 exhibited long-term clarity at a solids concentration of 75%, and that some samples had the required descriptive ratio. Accordingly, the district court correctly found that ARD 2370 infringed the product claims.

F. *Exceptional Case.* GPC contends that Maize deliberately set out to copy the patented product and should therefore be liable for increased damages and attorney fees. *See* 35 U.S.C. §§ 284, 285. Because there are insufficient factual findings for us to resolve either claim, we remand to the district court to make the necessary findings. *See Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1244, 222 USPQ 649, 654 (Fed.Cir. 1984) (remanding case for "further consideration and elaboration of the award of attorney fees").

### Conclusion

The parties' remaining arguments have no merit. Accordingly, the holding that Fro–Dex 10 did not infringe claims 12–14 is

reversed, and the case is remanded to the district court to determine whether GPC is entitled to increased damages and attorney fees. The decision is affirmed in all other respects.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.