**Robert W. KEARNS, Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

No. 78–70740.

United States District Court,
E.D. Michigan, S.D.

Nov. 27, 1989.

See also, 114 F.R.D. 57.

William Durkee, Paul Janicke, and Christopher R. Benson, Arnold, White & Durkee, Houston, Tex., for plaintiff.

D. Dennis Allegretti, Bradley J. Hulbert, Allegretti & Witcoff, Ltd., Chicago, Ill., Charles G. Call, Allegretti & Witcoff, Ltd., Boston, Mass., for defendant.

MEMORANDUM AND ORDER *

COHN, District Judge.

### I.

This is a patent case. Plaintiff Robert W. Kearns (Kearns) asserts that defendant Ford Motor Company (Ford) infringed patents that he owns—United States Patents No. 3,351,836; No. 3,564,374; No. 3,581,178; No. 3,602,790; No. 3,796,936; and No. 3,582,747—relating to electronic intermittent windshield wiper (IWW) systems. Kearns filed suit in 1978, alleging that Ford began its infringing activities in 1969. On April 24, 1989, the Court set a tentative trial date for November 27, 1989. On Sep-

* This is a revision of the Court's bench remarks of November 4, 1989.

tember 22, 1989, Ford filed a motion styled "Motion in Limine to Exclude Evidence of Ford's Revenues and Profits" to keep evidence of the mark-up over manufacturing cost, reflected in the prices Ford charges dealers for parts and accessories, out of the damage phase of the trial.[1] Kearns has responded.

Kearns seeks to introduce evidence regarding Ford's mark-up on IWW systems sold to dealers; Ford's sales forecasts; Ford's marketing and advertising of IWW systems; Ford's IWW manufacturing and installation costs; and Ford's decision to introduce IWW systems as an option, part of a convenience group or as standard equipment on each automobile manufactured by Ford. Kearns says that the mark-up on accessories such as IWW systems represents profit to Ford. Ford opposes admission of this evidence, arguing that the evidence is irrelevant to the issue of damages. For the reasons that follow, Kearns is prohibited from making any reference at trial before the jury, without prior approval of the Court, to the prices Ford charges to dealers for IWW systems.

## II.

The methodology of assessing damages under 35 U.S.C. § 284 is within the sound discretion of the Court.[2] *Yarway v. Eur-Control USA, Inc.,* 775 F.2d 268, 275 (Fed. Cir.1985). Section 284 does not mandate how the district court must define computation of damages as long as it allows compensation to the injured party for the infringement. *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964). As a consequence, courts have taken different approaches to the methodology of as-

sessing damages, including relying on different types of information in making an assessment.

### A.

■ Kearns argues that it can be inferred from *TWM Mfg. v. Dura Corp.,* 789 F.2d 895, 899 (Fed.Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986), that evidence pertaining to Ford's mark-up over manufacturing costs is clearly relevant to a determination of damages, either in the form of lost profits to him or a reasonable royalty to be paid to him should he succeed in establishing liability. As a threshold matter, it is clear that Kearns is not entitled to lost profits as a measure of damages because he cannot meet the test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152 (6th Cir. 1978). *Panduit* requires that Kearns show the existence of a demand for the patented product, an absence of acceptable noninfringing substitutes, the manufacturing and marketing capability to exploit the demand, and the amount of profits he would have made. *Id.* at 1156.

Kearns's proposed findings of fact[3] establish that he does not meet the *Panduit* requirements. Kearns's proposed finding of fact (PFF) # 515 states that "[b]ecause of the infringement, Kearns lost his opportunity to build a company" that would supply electronic controls to the automobile industry. This proposed finding is revealing. First, Kearns clearly had no existing capability to exploit any demand for his IWW control circuits at the time of infringement. Second, the conclusory nature of PFF # 515 requires that Kearns offer proofs as to the plans undertaken, the capital raised or available, and the other cir-

---

1. In its papers, Ford employs four terms to describe the mark-up over the manufacturing cost or "transfer price" of an IWW system. "Gross sales price" is the price charged for an IWW option; "total revenue" attributable to the IWW option is the gross sales price multiplied by the number of IWW systems sold; and "accounted" or "economic" profit is the total revenue less selected expenses. Kearns's papers refer to this data as Ford's "profits" or the "profitability" of IWW systems. Throughout this memorandum, the Court will refer to "account-

ed" or "economic" profit as the mark-up over manufacturing cost.

2. Since the issue of damages will be submitted to a jury, much of the discussion that follows relates to the manner in which the Court will instruct the jury.

3. In Pretrial Order No. 3, the Court required Kearns and Ford to file proposed findings of fact.

cumstances pertaining to intentions to organize a company to manufacture his electronic controls. Kearns's PFF # 516–18 are clearly inadequate in this regard because they state in conclusory form only that Kearns intended to manufacture electronic controls in 1963 and in the 1970s. Neither of these time periods coincides with the time that the alleged infringement began. In addition, these conclusory statements lack sufficient detail to even suggest that producing electronic IWW control circuits would have been a realistic option for Kearns. Under the rules established in *Panduit*, lost profits simply cannot be a component of any damages awarded in this case.

### B.

#### 1.

From examining both parties' proposed findings of fact, it appears that there will be no evidence offered at trial as to any established royalty. *See Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078–79 (Fed.Cir.1983). If there is such evidence, the jury most likely will be required to decide that question before determining what is a reasonable royalty. As the Court reads the cases and academic discussion as to what constitutes a reasonable royalty, it appears that the rules discussed below apply.

■ Determination of a reasonable royalty is based on the willing licensee-willing licensor rule. *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 788 F.2d 1554 (Fed. Cir.1986). *Radio Steel* says: "The determination of a reasonable royalty ... is based not on the infringer's profit, but on the royalty to which a willing licensor and licensee would have agreed at the time the infringement began." *Id.* at 1557. That is, a reasonable royalty is the royalty that a licensee would be willing to pay and that a licensor would require before granting a license if both parties wished to execute a license in an arms'-length transaction.

■ If there is a standard royalty in the automobile industry for component parts, then that is the royalty that is to be used. Ford's PFF # 58–99 provide some detail regarding "general industry practices" pertaining to royalty payments for component parts used in the manufacture of an automobile. However, they do not provide insight into any sort of industry-wide framework or formula that could be applied in calculating a reasonable royalty on an IWW control circuit. Ford's Proposed Pretrial Order indicates that it will elicit expert testimony from Chrysler Corporation, General Motors Corporation, and Ford employees regarding licensing practices at each company and in the automobile industry, yet Ford's PFF # 72–96 do not indicate that those experts will establish an agreed-upon standard for the industry. Rather, Ford's PFF # 72–96 suggest that Ford will establish a *range* within which a reasonable royalty should fall.[4]

■ Absent an agreed-upon industry-wide royalty, then, a reasonable royalty formula must be determined. In constructing a royalty formula, hindsight may not be used. Instead, the basis for such a formula must be a hypothetical negotiation occurring just prior to the infringement. *TWM, supra* at 899. The royalty formula has two components. The first is a royalty rate expressed as a percent of a dollar figure, customarily the sale price of the licensed device. The second component is the sale price of the licensed device. Here, the allegedly infringing circuits are sold from one Ford division to another. This sale price is what is commonly known in the industry, based on the Court's experience, as the buy-or-make price. In other words, manufacturers such as Ford, in deciding whether or not to make inter-division sales, customarily determine what it will cost to manufacture a part and what it would cost to buy that part from third parties.

Ford, in arguing for its position, relies heavily on the decision in *Ellipse Corp. v.*

---

4. The Court recognizes that industry standards need not set the ceiling for the royalty assessed. *See Bio–Rad Laboratories, Inc. v. Nicolet Instru-* *ment Corp.,* 739 F.2d 604, 617 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).

*Ford Motor Co.*, 461 F.Supp. 1354 (N.D.Ill. 1978), *affirmed*, 614 F.2d 775 (7th Cir. 1979), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 792 (1980). In *Ellipse*, the district court stated that the plaintiff, who successfully sued for infringement, could not apportion a profit to the infringing device because such an apportioned profit "ha[d] no relevance to the determination of a reasonable royalty." *Id.* at 1380. The Court believes that the same is true here. As in *Ellipse*, Ford manufactures the allegedly infringing devices used in its automobiles, and therefore there is no separate profit attributable to them when the automobile is sold. A reasonable royalty on an IWW circuit would be merely one of many costs covered by the total price of an automobile.

■ For this reason, the prices charged to dealers, which include the mark-up over manufacturing cost, when the IWW circuit is sold separately are irrelevant to the hypothetical royalty negotiations. These prices reflect marketing techniques and cost allocations, not manufacturing costs. Therefore, under Federal Rule of Evidence 402, Kearns is not entitled to introduce evidence pertaining to the mark-up over manufacturing costs and the prices Ford charges dealers for IWW systems; Ford's sales forecasts; Ford's marketing and advertising of IWW systems; and Ford's decision to introduce IWW systems as an option, part of a convenience group or as standard equipment on each model. Certainly, absent expert testimony that, in a negotiation for a license in 1969, the mark-up over manufacturing costs and the suggested retail price of an IWW system containing the licensed circuit would have been a consideration, evidence regarding such amounts must be excluded. Likewise, the fact that the IWW feature may be standard or optional, either singularly or as part of a package is irrelevant, unless expert testimony is available to the effect that such a fact would have been part of the negotiations for a license. And nothing before the Court remotely suggests that such expert testimony is available. On the other hand, Ford's IWW circuit manufacturing costs are undoubtedly relevant and admissible.

2.

Kearns relies on cases where the royalty was based in part on the infringer's profits and expressed as a percentage of the infringer's selling price. However, the Court notes that:

> [l]icensing parties seldom agree to use cost or profits as a royalty base, because the licensee normally does not desire to divulge to the licensor any more proprietary business information than is necessary. Cost or profit bases also complicate the accounting process, since cost and profit figures are based on a variety of documents and accounting principles.

Finnegan & Mintz, *Determination of a Reasonable Royalty in Negotiating a License Agreement: Practical Pricing for Successful Technology Transfer*, in *The Business of Licensing* 3D–3, 3D–6 (1984). Moreover, all of the cited cases appear to involve circumstances where the infringer contemplated sales to third parties, not intra-company sales such as those involved here and in *Ellipse*. For example, in *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed.Cir. 1984), the Court of Appeals for the Federal Circuit held that the profits from increased sales generated by use of the infringing display racks could be used in determining a reasonable royalty. *Trans–World* differs from the facts here in that the plaintiff there designed, manufactured, and sold its own display racks, and the defendant arranged for other companies to make the racks that were held to be infringing. Unlike Ford, the defendant was not capable of making the infringing devices for its own use. Furthermore, the display racks themselves can be distinguished from IWW control circuits because they were intended to be used as marketing devices. Therefore, including a portion of the infringer's sales of the eyeglasses held in the racks in a reasonable royalty calculation made sense. However, IWW control circuits are not built, in part, to be used as marketing devices for automobiles, and apportioning increased sales of these circuits as an op-

tion to the buyer of any automobile makes no sense.

In *TWM, supra* at 899, the Court of Appeals for the Federal Circuit also upheld the district court's decision to base a reasonable royalty on projected profits rather than on actual profits, while acknowledging that evidence of both would be admissible. The plaintiff and the defendant were competitors in the same market because they both manufactured truck axles. Admitting evidence of profits was proper because the plaintiff, unlike Kearns, could establish that it actually lost sales because of defendant's infringement. The case did not involve intra-company sales of component parts. Lastly, the leading case in this field, *Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970), *aff'd as modified*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971), involved competing manufacturers of wood products, not component parts, and not intra-company transfers.

In sum, Kearns's approach to the appropriate damage computation would not accurately compensate him for the loss he suffered as a consequence of Ford's alleged infringement. Rather, it would give him a gigantic windfall based on considerations wholly internal to Ford and having no reference whatsoever to the realities of the relationship between them as putative licensor and putative licensee.

SO ORDERED.