Robert W. KEARNS, Plaintiff,

v.

WOOD MOTORS, INC.,
et al., Defendants,

v.

SWF–SPEZIALFABRIK, Declaratory
Judgment Plaintiff.

No. 78–70642.

United States District Court,
E.D. Michigan, S.D.

Dec. 20, 1990.

Chris Benson, Houston, Tex., for plaintiff.

Donald E. Knebel, Indianapolis, Ind., Nick Coch, New York City, for defendants.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This is a patent infringement action, 35 U.S.C. § 1 *et seq.* Plaintiff Robert W. Kearns (Kearns) asserts that defendants Daimler–Benz Aktiengesellschaft (Daimler–Benz) and Porsche A.G. (Porsche) infringed patents that he owns—United States Patents Nos. 3,351,836 (the '836 patent) and 3,564,374 (the '374 patent)—relating to electronic intermittent windshield wiper (IWW) systems. Daimler–Benz has filed a motion for summary judgment, arguing that the '836 patent and the '374 patent are invalid under 35 U.S.C. § 102(b) because the devices described in those patents were in public use more than one year prior to the filing of patent applications.[1] Kearns has responded, arguing that he never relinquished possession or control of the devices during the time period in question and that his use of his inventions was experimental. Because the Court finds that the devices were not in public use, Daimler–Benz's motion for summary judgment is DENIED.

### II.

#### A.

After the close of proofs in the liability phase of the trial in *Kearns v. Ford Motor Co.*, No. 78–70740, the Court directed a verdict on the public use issue. Daimler–Benz now raises precisely the same issue, arguing that its motion is based on a broader record than that relied on by the Ford Motor Company (Ford). Despite this claim and reference to some documents not involved in the Ford litigation, the Court finds that the subject matter of this motion differs little from that governed by its directed verdict in the Ford case.

#### B.

The following facts are not disputed by the parties. Kearns did not file a patent application for the device described by the '836 patent until December 1, 1964. The '374 patent is a divisional of the '836 patent and resulted from the same application as the '836 patent. Thus, the '374 patent also has an effective filing date of December 1, 1964. As a consequence, any attempts by Kearns to commercially exploit the devices prior to December 1, 1963 (the critical date) would invalidate the patents under the public use doctrine.

By September 30, 1963, Kearns had reduced to practice the devices described in the '836 and '374 patents, installing his electronic IWW system on his 1962 Ford Galaxy. However, the Kearns system still contained at least one major flaw. On hot days, the system would turn on by itself because of a problem with transistor leakage. This defect was not corrected until 1964. Kearns also did not know whether the system would meet industry requirements for reliability. Kearns did not complete reliability tests until 1964.

On October 22, October 25, and on November 3, 1963, Kearns demonstrated his electronic IWW control system to various people at Ford. Those people included John Ciupak, Ted Daykin, Mike Bozoian, Joe Neill, Tom Feahney, Gil Lambert, and George Long. Kearns also demonstrated his control system to three separate divisions of Chrysler Corporation (Chrysler) on October 29, 1963. Kearns's purpose in conducting the demonstrations was two-fold: he needed to obtain durability specifications that would enable him to correct the flaw in his system and test its reliability, and he wanted to interest the automobile manufacturers in his system. Kearns fulfilled the former purpose by obtaining information as to the engine compartment temperature that his IWW system would have to withstand (270 degrees fahrenheit) and as to Ford's durability or life-cycle

---

1. On October 12, 1990, Porsche and declaratory judgment plaintiff SWF–Spezialfabrik filed papers styled "Submission in Support of Daimler–Benz's Motion for Partial Summary Judgment."

requirement (the device would have to complete three million cycles without failure).[2] The latter purpose is tempered by the fact that, despite his dream of becoming an industry supplier, Kearns himself never possessed the capability to exploit any demand for his IWW systems. *See Kearns v. Ford Motor Co.,* 726 F.Supp. 159, 161 (E.D.Mich.1989).

Kearns's brother, Martin Kearns, was employed by Ford as a design engineer and arranged the demonstrations at Ford. At his deposition, Martin Kearns testified that he arranged the demonstrations in an effort to interest someone at Ford in his brother's IWW system. Nevertheless, Martin Kearns admitted that he had only been at Ford "a couple of months" and did not really know who Kearns should have been trying to interest, stating, "If I was advising someone now how to do it, I would have put him in a very different direction." Daimler–Benz Ex. 30 at 99. At the time, Kearns believed he was with the proper executives and in the proper channels to qualify as a supplier to Ford, despite the fact that he had no means of becoming a supplier. However, during the demonstrations in question, Kearns met only with engineering personnel. He did not meet with anyone from purchasing. Thus, even though Kearns responded to requests for price quotations following his demonstrations, his response could not have resulted in a purchase order.

As to the individuals with whom Kearns met, Ted Daykin (Daykin), supervisor of the Windshield Wiper Engineering Section of the General Parts Division at Ford, was a part of the proper engineering channels. When a supplier approached the General Parts Division with a new product, the appropriate person from the division would work with the supplier to provide specifica-tions applicable to that product area. For example, in 1961 and 1965, two automotive suppliers demonstrated IWW systems to Daykin, who was involved in evaluating windshield wiper control systems, both those proposed both by outside suppliers and those from within Ford, and recommending what systems Ford should adopt.

The record reveals little about the Chrysler demonstration. Kearns did not have a brother working at Chrysler to arrange a demonstration for him. However, he appears to have met with people in positions similar to those of the people at Ford. Whether or not Chrysler developed new products in the same manner as Ford is unknown. Whether automotive suppliers demonstrated other IWW systems to the same people at Chrysler also is unknown.

At the demonstrations, Kearns executed a waiver of any obligation of confidentiality as to both Ford and Chrysler. Throughout the demonstrations, the electronic IWW control was housed in a red metal box marked "For Engineering Tests Only. Do Not Open. Proprietary Design of Kearns Engineers." The control itself was not shown to Ford or Chrysler engineers, nor did Kearns relinquish possession of it at any time.

### III.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). With the summary judgment "revolution" of the 1980s now an accepted fact of life, the import of this language has become abundantly clear.[3] Absent any disagreement by the parties

---

**2.** The Court is unpersuaded by Daimler–Benz's assertion that Kearns could have obtained the information that he received from Ford from his brother. It is clear that Martin Kearns did not know the specific engine compartment temperature, and he was unsure as to precisely when his brother asked him for life-cycle information. More importantly, if Kearns could have gotten the information from his brother, it is unlikely that he would choose not to do so

and demonstrate a flawed and untested system to the automobile manufacturers.

**3.** For a thorough review of the United States Supreme Court's trilogy of decisions increasing the availability of summary judgment, see Issacharoff & Loewenstein, *Second Thoughts About Summary Judgment,* 100 Yale L.J. 73, 76–94 (1990).

over the standards applicable here, the Court turns to the substance of Daimler–Benz's motion.

## A.

Section 102(b) provides that a patent may be invalid if the invention was "in public use ... in this country, more than one year prior to the date of the application for patent." This provision, like the on sale provision, is designed to preclude attempts to commercially exploit an invention more than a year before the patent application is filed. *Grain Processing Corp. v. American Maize–Products*, 840 F.2d 902, 906 (Fed.Cir.1988) (citation omitted). "Public use" has been defined as "any use of that invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." *Id.* (citation omitted). However, the totality of the circumstances relating to the character and extent of the commercial activities must be considered under section 102. *Id.* It is well-established that "commercial exploitation by the inventor of a machine or process is a public use even though the machine or process is held secret." D. Chisum, *Patents* § 6.02[5], at 6–43.

## B.

The crux of the dispute embodied in Daimler–Benz's motion for summary judgment lies in the parties' differing characterizations of Kearns's visits to Ford and Chrysler during October and November 1963. Kearns contends that he demonstrated the IWW control, keeping its inner workings secret at all times, to Ford and Chrysler for experimental purposes, while Daimler–Benz argues that Kearns visited the automobile manufacturers for the sole purpose of commercializing his inventions. Moreover, Daimler–Benz argues that because Kearns reduced his inventions to practice in September 1963, he cannot claim that any public use of them prior to the critical date was experimental.

■ The Court addresses the latter argument first. Daimler–Benz relies on *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed.Cir.1989), for the proposition that any possibility of experimental use ends with reduction to practice. However, that decision was rendered in a case involving the on sale doctrine, not the public use doctrine. While these two grounds for invalidating a patent are undeniably related, they are not interchangeable.

The Court of Appeals for the Federal Circuit summarized its holding in the *RCA* case by saying: "[H]aving been reduced to practice, a sale or offer to sell the ... invention is no longer justifiable as an experimental use." *Id.* Furthermore, the Federal Circuit only stated that reduction to practice precludes experimental use because RCA was attempting to argue that the invention was not the subject matter of the sale. *Id.* The activities involved here were demonstrations and not offers for sale. Therefore, it cannot be said that they are not justifiable as experimental uses despite the admitted reduction to practice. Absent Daimler–Benz's citation to a public use case reaching a contrary result, the Court declines to rule out the possibility that Kearns demonstrated his inventions for experimental purposes.[4]

■ Public use may be established in two ways: either by showing that a nonsecret, nonexperimental use occurred prior to the critical date or by showing that the inventor used his invention primarily for trade or profit, either secretly or openly, prior to the critical date. *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 277 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). Daimler–Benz seeks summary judgment on the second ground, arguing that Kearns's demonstrations to Ford and

---

4. For recent case law supporting this position, see *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544 (Fed.Cir.1990). In *RCA*, the Federal Circuit defined "reduction to practice" as, *inter alia*, the building of an actual embodiment of the invention which includes all the elements of the claim. Nothing in the Federal Circuit's opinion in *Manville* suggests that the embodiment of the invention that was tested for several months in the open air did not include all the elements of the claim. Nevertheless, the Federal Circuit treated the use as experimental.

Chrysler were impermissible commercializations of his inventions.

Throughout its papers, Daimler–Benz cites cases in which pre-production marketing was held to be a public use. Nevertheless, none of the cases cited is directly on point. In *Kinzenbaw v. Deere & Co.*, 741 F.2d 383 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985), Deere gave the machines containing the invention to farmers to test. Though secret, the farmers' use of the machines was determined to be public. Significantly, Deere failed to argue that the use was not public because it was experimental. *Kinzenbaw*, 741 F.2d at 389–90. Instead, it argued that the use was not public solely because it was secret. *Kinzenbaw* therefore stands for the proposition that, while secrecy is a factor to be considered in determining whether a use is public or experimental, it is not necessarily the controlling factor. 741 F.2d at 390. The Court does not quarrel with this proposition. However, because *Kinzenbaw* did not involve an experimental use argument like the one made by Kearns, it is of little import here.

Similarly, the other cases relied upon by Daimler–Benz involve commercial activities of a far different character than the demonstrations at issue here. In *Electro–Nucleonics, Inc. v. Mossinghoff*, 593 F.Supp. 125 (D.D.C.1984), the machine containing the invention was demonstrated at an industry trade show. In *Koehring Co. v. National Automatic Tool Co., Inc.*, 362 F.2d 100 (7th Cir.1966), the prototype embodying the invention was operating to the satisfaction of the inventor several months prior to the critical date, and it was demonstrated in connection with sales promotions. In *Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478 (Fed.Cir.1986), the invention was contained in a machine demonstrated to a reporter for a trade publication who then wrote an article about the machine.

■ Kearns never engaged in this sort of indisputably commercial activity. He did not engage in test-marketing to build a receptive market to which he could supply his IWW system. He did not attend a trade show or promote his invention in a trade publication. He did not provide the invention to potential consumers for testing. He was not engaging in a sales promotion. Quite simply, the IWW system was not working to his satisfaction at the time that he showed it to Ford and Chrysler in the hope of obtaining production specifications. Therefore, none of the cases cited by Daimler–Benz provides the Court with a basis to find that Kearns's demonstrations were public uses of his inventions.

Furthermore, Daimler–Benz's arguments entirely ignore the policies underlying § 102(b). These underlying policies include: discouraging the removal of inventions from the public domain when the public justifiably has come to believe that they are freely available; prohibiting an extension of the period for exploiting the invention; and favoring prompt and widespread disclosure of inventions. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 549 (Fed.Cir.1990). If the totality of the circumstances comports with the underlying policies of the public use bar, there can be no violation of the statute. *See id.*

The Court finds that Kearns's demonstrations did not violate any of the policies articulated above. Kearns did nothing to lead the public to believe that his invention was in the public domain. To the contrary, at the demonstrations, his IWW control circuits were concealed in a red metal box marked "For Engineering Tests Only. Do Not Open. Proprietary Design of Kearns Engineers." Kearns did nothing to extend the patent term by commercially exploiting his inventions more than one year before he filed a patent application. No one present at the Ford and Chrysler demonstrations could have authorized a purchase of the Kearns IWW system. Nor did Kearns offer his inventions for sale prior to the critical date. Finally, Kearns did nothing inconsistent with the prompt and widespread disclosure of inventions. Like the inventor in *Manville*, Kearns had no confidence that his invention would work properly under conditions of actual use; there-

fore, there was no "proven invention" to disclose. *Id.* at 550.

Daimler–Benz argues that Kearns's demonstrations were an impermissible attempt to extend the patent term, attempting to distinguish *Manville*. In *Manville*, the Federal Circuit ruled that a winter-long use of a lighting assembly at a highway rest area in Wyoming did not constitute a public use because of its experimental nature. Daimler–Benz contends that Kearns's demonstrations were not "experimental" because they were not experiments in and of themselves. In this regard, Daimler–Benz says that Kearns's demonstrations differ from the use permitted in *Manville* because that use was a test of the invention's durability in an outdoor environment.

This definition of the term "experimental" is too narrow. The Court will not be swayed so easily by the catchwords of the patent lawyer. The question is not whether Kearns's demonstrations were experiments, but rather whether Kearns's demonstrations constituted activities inconsistent with experimentation. In *American Maize–Products*, the Federal Circuit held that a company that provided samples of proposed products to food manufacturers for assessment of their utility, as was customary in the industry, did not engage in a public use invalidating its patent on a starch hydrolysate. Because there was "nothing inconsistent with experimentation" in the company's actions, there was no public use. 840 F.2d at 906. Here, Kearns may have engaged in activities consistent with commercialization, but those same activities need not have been inconsistent with experimentation. Just as the starch hydrolysates in *American Maize–Products* needed to be tested to assure that they would not interact adversely with other food ingredients, *Id.*, so the Kearns IWW system needed to be tested to assure that it would not interact adversely with the rest of the automobile on which it was installed.

Obviously, the information sought by Kearns was a necessary prerequisite to the commercialization of his inventions. He could never sell an IWW system that would not meet the automobile manufacturers' standards. However, that does not preclude a finding that his demonstrations at Ford and Chrysler were not experimental. Kearns's IWW system was basically homemade at the time of the demonstrations. While he might have had an idea of how the device functioned on his car, Kearns certainly could not have predicted how it would work on other cars in a mass-production setting. He needed to demonstrate the system to Ford and Chrysler in order to interest them enough to get the specifications that would enable him to transform his IWW system into a proven invention. There was no public use.

SO ORDERED.